UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED

OCT 2 8 2010

USDC WP SDN

---

PAUL D. KAPLAN, on behalf of himself and all others similarly situated,

Plaintiff,

- against -

JPMORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES INC., J.P. MORGAN FUTURES INC., HSBC HOLDINGS PLC, HSBC SECURITIES (USA) INC., HSBC BANK USA NATIONAL ASSOCIATION, AND JOHN DOES 1-10,

Defendants.

Docket No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**10 CV 08180**

---

Plaintiff Paul D. Kaplan ("Plaintiff"), by his undersigned attorneys, brings this action

against Defendants JP Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities

Inc., J.P. Morgan Futures Inc. (the "JP Morgan Defendants"), HSBC Holdings PLC, HSBC

Securities (USA) Inc., HSBC Bank USA National Association (the "HSBC Defendants"), and

John Does 1-10 (collectively with the "JP Morgan Defendants" and "HSBC Defendants", the

"Defendants") pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. § 1, *et seq.* (the

"CEA"), Sherman Antitrust Act, 15 U.S.C. § 1, and New York common law, on behalf of

themselves and all others who transacted in silver futures and options contracts traded in this

District on the Commodity Exchange Inc. ("COMEX") division of the New York Mercantile

Exchange ("NYMEX") between March 1, 2008 and the present (the "Class Period").

Plaintiff's allegations as to themselves and their own actions are based upon their

personal knowledge and on information obtained during the course of their attorneys'

investigation, including, but not limited to, the analysis and review of (a) October 26, 2010

public statements made by Bart Chilton, the current Commissioner of the Commodity Futures

Trading Commission ("CFTC"), that the silver market has been and is being manipulated;

(b) public news reports concerning a two-year pending investigation by the CFTC of

manipulation in the silver market; (c) public news reports of JP Morgan's recent decision to close

its metals trading operation; (d) statements made at the March 25, 2010 Meeting of the CFTC to

Examine Futures and Options Trading in the Metals Markets; (e) market data, price, open interest

and volume information for COMEX silver options and futures contracts; (f) COMEX silver

future and options settlement practices; (g) precious metals futures trading market commentary;

and (h) other public reports of the information alleged herein, and upon information and belief as

to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises from the Defendants' unlawful and intentional manipulation of

the prices of, and combination, agreement and conspiracy to restrain trade in, COMEX silver

futures and options contracts during the Class Period in violation of Sections 9(a)(2) and 22(a) of

the CEA, 7 U.S.C. §§ 13(a) and 25(a), Section 1 of the Sherman Act, 15 U.S.C. § 1, and New

York common law.

## JURISDICTION AND VENUE

2.      Silver is a "commodity" and is the "commodity underlying" COMEX silver

futures and options contracts traded on the COMEX, as those terms are defined and used in

Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

3.      This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and New York law, respectively.

4.      This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.

5.      Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d).  Plaintiff resides in this District. Each of the Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.  Defendants' unlawful acts manipulated the prices of COMEX silver futures and options contracts which were traded in this district in which the COMEX division of the NYMEX is located, at One North End Avenue, New York, New York.  On or about March 17, 2008, CME Group, Inc., the parent of the Chicago Mercantile Exchange, acquired NYMEX Holdings, Inc., the parent of NYMEX.

6.      Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

7.      Plaintiff Paul D. Kaplan, a natural person residing in New York, New York, purchased COMEX silver futures contracts during the Class Period and sold those contracts later in the Class Period at artificially suppressed prices that Defendants caused, and was thereby

injured in his property as a result of Defendants' unlawful conduct. For instance, Plaintiff purchased thirty (30) COMEX silver futures contracts on May 21, 2008 for an average price of $1,875 per contract and sold those contracts on October 23, 2008 for an average price of $952.10 per contract, for a realized loss of $1,384,900.00.

8.     Defendant JPMorgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York. JPMorgan Chase & Co. is a leading global financial services firm and one of the largest banking institutions in the United States with $2.1 trillion in assets, $164.7 billion in stockholders' equity, and operations in more than 60 countries.

9.     Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear Stearns Securities Corp., is a Delaware corporation with its corporate offices in Brooklyn, New York. JPMC is a subsidiary of J.P.Morgan Securities LLC which is a wholly owned subsidiary of JPMorgan Chase & Co. JPMC is a registered Futures Commission Merchant with the CFTC.

10.     Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York. JPMS is a wholly owned subsidiary of JPMorgan Chase & Co. JPMS, through JPMC, provides securities and futures clearing, customer financing, securities lending and related services.

11.     Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York. JPMFI is a U.S. futures commission merchant and wholly owned subsidiary of JPMorgan Chase & Co. JPMFI provides research, sales, execution and clearing services in futures and options across fixed income, equity, foreign exchange and commodity asset classes. JPMFI holds the U.S. accounts of JPMorgan Chase's global futures and options business customers.

12.     Defendant HSBC Holdings plc (HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England. As of 2009 HSBC Holdings was the world's largest banking group and the world's sixth largest company according to Forbes Magazine.

13.     Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York. HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc. whose ultimate parent is HSBC Holdings plc. HSBC USA is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and is a registered Futures Commission Merchant with the CFTC.

14.     Defendant HSBC Bank USA National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

15.     Plaintiff alleges on information and belief that at all relevant times, Defendants John Does Nos. 1-10, inclusive, who performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the prices of COMEX silver futures and options contracts as alleged herein. Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as John Does Nos. 1-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does Nos. 1-10, inclusive.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

#### A.   Overview of COMEX Silver Futures and Options Contracts

16.     Silver futures contracts and silver options contracts are traded on COMEX.

17.     COMEX, a division of NYMEX, has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures and options contracts for silver.  COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts.

18.     COMEX provides standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 60 sequential months into the future depending upon the month in which the contract was executed.  A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future.  The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

19.     Trades of silver futures contracts on the COMEX have two "sides."  The "long" side represents the buyer of a contract who is obligated to pay for the silver and take delivery.  The "short" side represents the seller of a contract who is obligated to receive payment for the silver and make delivery.  If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery."  That is to say, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical silver.  Longs must take delivery

and shorts must make delivery of 5,000 troy ounces per contract over the course of the contract month. The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

20.     Only a very small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a silver futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of silver by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

**B.     Short Option Positions**

21.     There are a number of ways to "go short," *i.e.*, bet that the price of silver will decrease. As discussed above, one can sell a futures contract which confers upon the seller an obligation to deliver silver at a pre-specified date in the future at a pre-specified price. Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to purchase silver from the seller at a pre-specified "strike price" at some date in the future (*i.e.*, expiry). At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option, which means the seller will pay the difference between the prevailing price and the strike price. Conversely, if the price of silver falls short of the strike price, the option expires "out of the money."

22.     In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices fall. In the case of selling a futures contract, the seller at time of contract expiration simply offsets his position by purchasing a futures

contract and pockets the difference in prices. In the case of a call option, the seller benefits if the prevailing price is below the strike price because it collects the option premium and pays nothing to the purchaser.

23.     Upon information and belief, during the Class Period, Defendants had net short positions in silver options contracts, including but not limited to, the sale of call options.

### C.     Physical and Futures Prices for the Underlying Physical Commodity are Directly Related to One Another

24.     The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date. Because a futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be, and are in fact, correlated. For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month. The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

25.     For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month. Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected. Thus, the increase today in futures price (for delivery next month) has caused producers to decrease the available supply of the commodity and prompted buyers of physical silver to increase their demand. The decrease in supply coupled with the increase in demand, causes today's spot prices for the commodity to increase. The same causal economic story (albeit in reverse) prevails if futures prices decline.

26.     Therefore, changes in futures prices for delivery months into the future have tangible effects on physical spot prices today.  Put statistically, futures prices and physical spot prices are linked and correlated.

## II.     Through Their Enormously Concentrated Short Positions, Defendants Had the Power to and Did Suppress to and/or Maintain at Artificial, Manipulated Levels the Prices of COMEX Silver Futures and Option Contracts During the Class Period

27.     The silver futures market is a thin market.  The number of futures contracts traded in the silver market is small, *i.e.*, thin, in comparison to markets involving other commodities. For instance, in August 2008, there were only 129,240 open interest silver futures contracts, *i.e.*, silver futures contracts that had not yet settled, as opposed to 1.25 million open interest NYMEX Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

28.     The relatively sparse number of silver futures contracts regularly traded on COMEX enabled large banks, such as Defendants, to manipulate the price of silver futures contracts during the Class Period by flooding the market with a disproportionate number of contracts.

29.     In addition, the market for COMEX silver futures and options contracts is highly concentrated with only a  handful of very large banks controlling a dominant number of futures and options contracts.

30.     In August 2008, subsequent to JPMorgan's acquisition of Bear Stearns, Defendants JPMorgan and HSBC controlled over 85% of the commercial net short position in COMEX silver futures contracts and 25% of all open interest short positions.

31.     In the first quarter 2009, HSBC NA held 40% of all precious metals derivatives

(excluding gold) held by commercial banks.

32.    As of the first quarter 2009, Defendants owned more than 96 percent of all precious metal derivatives held by U.S. banks (excluding gold) with a combined notional value of $7.9 billion.[1]

33.    Prices in the silver futures and options market respond much more to large orders, large trades, and large positions than do prices in other commodity markets.

34.    Because the COMEX silver market was thin, large banks such as Defendants were able to manipulate the price of COMEX silver futures and options contracts during the Class Period by controlling the market with manipulative dominant positions and manipulative trading strategies.

35.    The COMEX silver futures and options market is highly concentrated with only a handful of very large banks controlling a dominant number of futures and options contracts.

36.    For instance, in March 2008, JPMorgan purchased Bear Stearns, which at the time of acquisition, had already amassed a significant short position in silver contracts.

37.    By August 5, 2008, subsequent to JPMorgan's acquisition of Bear Stearns, Defendants JPMorgan and HSBC controlled over 85% of the commercial net short position in COMEX silver futures contracts, representing a massive short position of 33,805 contracts or more than 169 million troy ounces of silver. This short position was equal to an approximately 25% of annual world mine production of silver.

38.    By the first quarter of 2009, Defendants owned more than 96 percent of all precious metal derivatives held by U.S. banks (excluding gold but including silver) with a

---

[1] The "notional value" is the value of a derivative's underlying asset as determined by the asset's spot price. In the case of an options or futures contract, the notional value is the number of units of the asset underlying the contract

combined notional value of $7.9 billion.

39.     Defendants consistently maintained their massive short positions until March 2010 when the public complaints about manipulation began through public statements made by Andrew Maguire ("Maguire"), a London-based metal trader and former trader for Goldman Sachs, in or about March 30, 2010.

40.     According to Maguire, traders for the JP Morgan Defendants bragged during the Class Period about their large trades which successfully moved silver prices.

41.     During certain times of the day (typically when trading volume on the COMEX is light), Defendants rapidly dumped large numbers of COMEX silver futures contracts at or around the same suppressed price. It was understood among Defendants and their co-conspirators that the price of these contracts would set the direction of silver futures contracts prices for that day. As Maguire explained in an email to Eliud Ramirez, Senior Investigator for the CFTC's Enforcement Division, dated January 26, 2010:

> As an example, if you look at the trades just before the pit open today you will see around 1,500 contracts sell at once where the bids were tiny by comparison in the fives and tens. This has the immediate effect of gaining $2,500 per contract on the short positions against the long holders, who lose that in moments and likely were stopped out.

42.     According to publicly available information, such "signals" were sent, among other times, on a monthly basis on or around the dates of certain key events, including: (a) following the United States Department of Labor's issuance of Non-Farm Payroll Reports[2],

---

multiplied by the spot price of the asset.

[2] The Non-Farm Payroll Report is an influential statistic and economic indicator released monthly by the United States Department of Labor as part of a comprehensive report on the state of the labor market.

which are released during the first week of each month; (b) at the time of Options Expiry[3] on the last four business days of each month; and (c) during COMEX silver futures contract roll-over.[4]

43.     In a subsequent email from Maguire to Ramirez, dated February 3, 2010, Maguire informed the CFTC that he had received a signal from Defendants indicating their intent to depress the prices of COMEX silver futures and options contracts two days later, at or around the time of the announcement of the Non-Farm Payroll Report. Maguire then predicted how the manipulation would play out in an email:

> Scenario 1. The news is bad (employment is worse). This will have a bullish effect on gold and silver as the U.S. dollar weakens and the precious metals draw bids, spiking them higher. This will be sold into within a very short time (1-5 mins) with thousands of new short contracts being added, overcoming any new bids and spiking the precious metals down hard, targeting key support levels.

> Scenario 2. The news is good (employment is better than expected). This will result in a massive short position being instigated almost immediately with no move up. This will not initially be liquidation of long positions but will result in stops being triggered, again targeting key support levels.

> Both scenarios will spell an attempt by the two main short holders [JPMorgan and HSBC] to illegally drive the market down and reap very large profits. Locals such as myself will be "invited" on board which will further add downward pressure.

44.     On February 5, 2010, Maguire emailed Ramirez "to confirm that the silver manipulation was a great success and played out EXACTLY to plan as predicted . . .." The price

---

[3] The expiration date of an options contract, a.k.a., Options Expiry, is the day on which an options contract is no longer valid and, therefore, ceases to exist. Because Defendants held net short positions in silver options contracts, Defendants profited by driving down the price of COMEX silver futures contracts. By depressing the price of COMEX silver futures contracts, Defendants assured themselves that the long options contracts opposite their positions would expire out of the money. Since the options expired worthless, traders who owned the positions opposite to Defendants did not exercise their options and Defendants reaped a profit.

[4] Contract rollover occurs each month when a futures contract holder exchanges (rolls over) an expiring contract position for a contract position which expires at a later date.

of silver fell dramatically following Defendants' manipulation just as Maguire had told the CFTC.

45.     Maguire's e-mail continued, "[h]ow would this be possible if the silver market was not in the full control of [JPMorgan and HSBC]. . . I hope you took note of how and who added the short sales (I certainly had a copy) and I am certain you will find it is the same concentrated shorts [JPMorgan and HSBC] who have been in full control since [JPMorgan] took over the Bear Stearns position."

46.     In March 2010, Maguire went public with his allegations and revealed his emails to the CFTC (quoted above) predicting certain market movements.

47.     Upon information and belief, Defendants began to unwind their massive short positions shortly thereafter. As reflected in the CFTC Bank Participation reports, the net short position of silver futures held by commercial banks, of which Defendants comprise the vast majority, have been reduced by more than 30% since March 2010.

48.     As Defendants' short position in COMEX silver futures contracts have decreased, the price of silver has risen dramatically.  Silver has gained 40 percent this year, touching $24.95 an ounce on October 14, 2010, its highest level in 30 years.

49.     On October 26, 2010, CFTC Commissioner Bart Chilton announced that there have been "violations of the Commodity Exchange Act in the silver market."  Specifically, Commissioner Chilton concluded, "[t]here have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted."  Commissioner Chilton indicated that the CFTC investigation was continuing and added that he was "hopeful that the agency will speak publicly about the investigation in the very near future."

50.     According to an October 27, 2010 article published in the *Wall Street Journal*, the

CFTC's enforcement staff has circulated a packet of information to CFTC lawyers and commissioners, outlining some of its findings in the silver probe, including documents that could suggest there have been attempts to manipulate prices.

51.     According to the same article, CFTC lawyers have interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on their own behalf and as representatives of a class ("Class") defined as all persons, corporations and other legal entities (other than Defendants, their employees, affiliates, parents, subsidiaries, and co-conspirators) that transacted in COMEX silver futures and options contracts during the period from March 1, 2008 and the present (the "Class Period").

53.     The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded COMEX silver futures and options contracts during the Class Period.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. These common questions of law and fact include, without limitation:

           a.     Whether Defendants' manipulation acts constituted a manipulative or unlawful act;

    b.  Whether Defendants injected into COMEX silver futures and options contracts illegitimate forces of supply and demand;

    c.  Whether Defendants manipulated COMEX silver futures and options contracts in violation of the CEA;

    d.  Whether Defendants combined, agreed, or conspired to suppress, fix, maintain, or stabilize COMEX silver futures and options contracts in violation of the antitrust laws;

    e.  The character, extent, and duration of Defendants' manipulation of COMEX silver futures and options contracts;

    f.  Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

    g.  Whether Defendants unjustly enriched themselves or are otherwise responsible for restitution under the common law;

    h.  The fact and degree of impact on COMEX silver futures and option contract prices from Defendants' course of unlawful conduct; and

    i.  The appropriate measure of relief.

  55.  Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

  56.  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse

to the interests of absent Class members. Plaintiff has retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation and antitrust class action litigation.

57.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

58.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

59.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for COMEX silver futures and options contracts.

60.     Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for COMEX silver futures and options contracts by,

among other things, engaging in secret "signals" or communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

61.     As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence before October 26, 2010, the date by which Bart Chilton, the current Commissioner of the CFTC, made public statements that the silver market has been and is being manipulated.

62.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.

63.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**AS AND FOR A FIRST CLAIM FOR
MANIPULATION IN VIOLATION OF THE
COMMODITY EXCHANGE ACT**
(7 U.S.C. § 1, *et seq.*)

64.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

65.     By their intentional misconduct, the Defendants each violated Sections 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), and caused prices of COMEX silver futures and options contracts to be artificial, including artificially suppressed and/or maintained, during the Class Period.

66.     Defendants' trading and other activities alleged herein constitute market power

manipulation of the prices of COMEX silver futures and options contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

67.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

68.     Plaintiff and others who transacted in COMEX silver futures and options contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

69.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CLAIM FOR
## VICARIOUS LIABILITY FOR MANIPULATION

70.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

71.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## AS AND FOR A THIRD CLAIM FOR RELIEF
## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

72.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

73.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

74.     During the Class Period, Defendants possessed market power in the market for the

sale of COMEX silver futures and options contracts.

75.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial prices for COMEX silver futures and options contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

76.     Defendants' conspiracy, and resulting impact on the market for COMEX silver futures and options contracts, occurred in or affected interstate and international commerce.

77.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

78.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT AND RESTITUTION

79.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

80.     It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of Plaintiff and members of the Class.

81.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

82.     Alternatively or additionally, each Defendant should pay restitution or its own

unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representatives, and their counsel as Class counsel;

(B)     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(D)     For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

(E)     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(F)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: White Plains, NY
      October 28, 2010

                                        LOWEY DANNENBERG COHEN
                                        & HART, P.C.

By: _____
                                        Vincent Briganti, Esq. (VB-1497)
                                        Geoffrey Horn, Esq. (GH - 4179)
                                        One North Broadway
                                        White Plains Plaza, 5th Floor
                                        New York, New York 10601
                                        914-997-0500

                                        Roger Kirby, Esq. (RK-4503)
                                        David Kovel, Esq.
                                        KIRBY McINERNEY LLP
                                        825 Third Avenue
                                        New York, New York 10022
                                        212-317-2300

                                        *Attorneys for Plaintiff*